In the Matter of LAWRENCE PROD-UCTS COMPANY, Inc., a Corporation, Debtor.

Bankruptcy No. 8182–M.

United States District Court
N. D. Alabama, M. D.
Sept. 18, 1962.

Inzer, Martin, Suttle & Inzer, Gadsden, Ala., for debtor.

Hinton & Torbert, Gadsden, Ala., for First Nat. Bank of Attalla.

ALLGOOD, District Judge.

This matter is before the Court on petition for review filed by the First National Bank of Attalla, Alabama. On April 9, 1962, the Referee enjoined the First National Bank of Attalla, Alabama, from proceeding to judgment in case No. 5109 in the Circuit Court of Etowah County, Alabama, styled The First National Bank of Attalla, a National Banking Association v. Benjamin Kahn and Rose Kahn; feeling aggrieved thereat, petition for review was properly and timely filed and certified.

The Referee has sent up with his certificate of review a transcript of testimony taken at the hearing held in Gadsden, Alabama, on December 6, 1961. The Court has taken this matter under submission on briefs, the record of all proceedings before the Referee and without oral argument.

This case raises a novel and unusual question due to the facts surrounding the taking of the note signed by Mr. and Mrs. Benjamin Kahn and upon which the bank has filed suit in State court which suit has been stayed by the Referee's order of April 9, 1962.

Lawrence Products Company, Inc., filed a petition for an arrangement under Chapter XI of the Bankruptcy Act on September 9, 1953. The two principal officers of the corporation were Benjamin Kahn and Rose Kahn. The schedules re-

veal that there was a first mortgage on the plant and equipment to Reconstruction Finance Corporation and the First National Bank of Attalla on which there was at that time an unpaid balance of $83,199.20. The debtor also scheduled an indebtedness to the said bank for $15,-429.50, setting out that this indebtedness was for notes payable to the First National Bank of Attalla, Alabama, for money borrowed.

A receiver was appointed and numerous meetings were held which were participated in by the bank and a partial liquidation of the properties under the mortgage was made by agreement with the Reconstruction Finance Corporation and the bank at prices and appraisals fixed by the mortgagees. By applying these receipts the mortgage indebtedness was reduced to $39,127.15 as of August 11, 1955, including principal, interest and attorneys' fees.

At this point the Reconstruction Finance Corporation filed a petition with the Referee praying that it be permitted to foreclose its mortgage. The First National Bank of Attalla had a participation agreement and an interest in the mortgage and joined in the petition to foreclose, although its name was not formally embodied as a party to the petition. Hearing on this petition was set and held on August 26, 1955. At the hearing attended by interested parties, David Kahn, brother of Benjamin Kahn, agreed to advance the sum of $34,000.00 which together with $5,127.15 paid by the Receiver was sufficient to satisfy the Reconstruction Finance Corporation mortgage and foreclosure was averted.

Subsequently, the debtor corporation proposed to pay a total of ten (10) per cent to its unsecured creditors in full settlement of its debts to them. It had been determined that the total amount due unsecured creditors was $236,299.92. This arrangement was accepted by a majority of each class of creditors and was duly confirmed by order of the Referee dated April 27, 1961. On this same date the Referee entered an order setting the proper amount of the debt due the First

National Bank of Attalla at $15,429.50 and classifying this debt as unsecured. No acceptance or formal proof of claim was filed by the bank. Later, a dividend check was issued in payment of this claim in accordance with the accepted plan duly and properly confirmed by the Referee. This check was in the amount of $1,542.-95 which sum represented ten (10) per cent of the original debt of $15,429.50.

The Referee's order dated April 27, 1961, clearly set out that the Receiver was thereby authorized to pay "all claims listed on the attached list of unsecured creditors" a first and final dividend of ten (10) per cent in accordance with the amended arrangement plan filed November 30, 1960. The order listed all claims to be paid and the correct amount for which said claims had been allowed or set by order of the Referee.

The unsecured debt due the bank by this debtor corporation was set at $15,-429.50 and the Receiver was authorized by the order to pay ten (10) per cent, or $1,542.95, to the First National Bank of Attalla in full settlement and satisfaction of this claim. At the time of the order no objection was filed by the bank nor was a review of the order sought or taken. The check was mailed to the bank and properly received. However, to this date the check has not been cashed and the bank has subsequently stated that it refused to accept same in full payment of their claim, setting out that it did not feel bound by the confirmation order and that the bank's debt was not discharged thereby.

In support of this position the bank asserts that its debt of $15,429.50 was a secured debt because of an "open-end" provision in the Reconstruction Finance Corporation mortgage, giving it the right to add the unsecured debt to the mortgage under the same security thereby increasing the mortgage indebtedness.

■ A careful search of the record does not reveal any testimony or documentary evidence that might tend to support the bank's claim of an "open-end" mortgage. The Reconstruction Finance

Corporation mortgage itself contained no clause setting out any such provision. The required permission for such an agreement or provision in the mortgage was neither sought nor obtained from the Reconstruction Finance Corporation. Furthermore, the evidence points to the treatment by the Kahns and the bank of this debt as being entirely separate and independent of the mortgage. It is also true that the bank, at the time the Reconstruction Finance Corporation mortgage was paid off and transferred to David Kahn, joined in and agreed to the transfer, making no reservations as to this debt. Therefore, it appears that the finding of the Referee that the bank has no security for this particular indebtedness was amply supported by the evidence in the case.

Secondly, the bank contends that it is not bound by the order of confirmation and that its debt is not discharged thereby, as are the other unsecured creditors. A hearing was set on August 26, 1955, for the purpose of avoiding foreclosure of the mortgage held by the Reconstruction Finance Corporation, in which the bank had a participation, and for the purpose of enabling Mr. Kahn's brother, David Kahn, to offer a proposal to advance enough money to purchase or to have transferred to him the remaining indebtedness on the mortgage after all of the available funds had been applied to same. As before stated, this amounted to some $34,000.00. At the hearing held on August 26, 1955, and during the progress of the hearing, the bank claims to have obtained a promissory note signed by Benjamin Kahn and Rose Kahn in the place of its unsecured debt and that it verbally transferred its debt due by the debtor corporation for their individual promise to pay the debt secured by their personal note.

It appears that during the hearing, while the Referee and attorneys representing the debtor corporation and the Reconstruction Finance Corporation were attempting to work out an agreement with David Kahn to advance sufficient funds to satisfy the balance of the mortgage, the president of the bank and his attorney called Mr. and Mrs. Benjamin Kahn to the rear of the courtroom or into the hall immediately adjoining the courtroom and persuaded them to sign a note for that part of the bank's claim which had been found to be unsecured in the amount of $15,429.50. There is evidence which tends to show that Mr. and Mrs. Kahn were told that if they did not sign the note the bank would block the reorganization or transfer of the mortgage and would insist on foreclosure of same. There is some dispute as to exactly what occurred during the conversation between the Kahns and the bank's president and its attorney. However, there is no dispute or claim that there was any other consideration for the signing of the note nor was there any dispute as to the apparent fact that the note was signed in the immediate vicinity of the courtroom and during the hearing. It was also without dispute a fact that neither of the Kahns advised their attorneys of this transaction until several years later when the note came due. The Referee was not advised of the transaction and had no knowledge of it. The Trustee was not made aware of the giving of this note nor were any of the other interested creditors advised of what was going on. The Referee found there was sufficient evidence to show that the note was obtained not only without knowledge of any of the other interested parties but also was obtained under duress and compulsion. There is no evidence in the file to controvert this finding.

There is no evidence that the debt of the bank was secured or was ever considered to be a part of the mortgage indebtedness. It was scheduled as a note, although a portion of the debt does appear to be for overdrafts of the debtor's bank account. The Referee treated it as unsecured and, in fact, determined it to be such in the order of distribution. It appears that for a good many years Mr. Benjamin Kahn, president of the debtor corporation, served as a director of the petitioner here, the First National Bank of Attalla.

The effect of the transaction in which the bank obtained the note for the entire amount of its unsecured claim did enable the bank to secure an advantage over the other unsecured creditors and to circumvent and avoid the efficacy of the order of confirmation treating all unsecured creditors in the same class and manner.

The Court feels that the taking of the note at the time of this meeting would not be proper and should be looked upon with suspicion even though it might have been voluntarily given. There can be no argument to the long well established law that in bankruptcy matters, all creditors of a class should be treated alike and that all parties to the case should, during the pendency of the case and before discharge, be fully informed of all proceedings therein that might affect their interest. The whole purpose of the Bankruptcy Act and of Chapter XI is to see that all creditors have their interest fully protected by the Court and the Court, as before stated, has a duty to see that no side or outside agreements or arrangements are made out of the knowledge of the Court and the other creditors. If this were not true, it would be impossible for the Court to control a creditor situation in a Chapter XI proceeding if any listed creditor were to be allowed to use any method at his disposal to persuade or compel a debtor or bankrupt to pay him in full or to give him any preferential treatment over the other creditors. This would create an intolerable and unconscionable situation.

In resolving this question, we must first determine if the Bankruptcy Court in administering a Chapter XI proceeding has the authority to control the parties before the Court in acts which tend to embarrass or defy the orderly reorganization of the debtor and to prevent the equal treatment of creditors. The answer to this question is made simpler by the fact that the note in question was taken in the immediate presence of the Court without the knowledge or consent of the Court or of other interested creditors and at a time when a plan was being worked out, the blocking of which would have completely ruined all chance of success of any arrangement with other creditors.

It is true that the Federal Court is most reluctant to use its injunctive power in State Court matters. Attorneys for the bank appear to take the position that if their suit was against the debtor corporation the injunction would properly lie. They point out that this note was secured from the officers of the corporation for their individual account and that for that reason they are not compelled to respond to the Bankruptcy Court. A proper comprehension of the scope, purpose and philosophy underlying the reorganization chapters of the Bankruptcy Act reveals the fallacy in their reasoning.

Thomas K. Finletter in his work "The Law of Bankruptcy Reorganization" in his chapter "Origins of Reorganization Provisions" sets forth the background and development of the rehabilitation chapters of the Bankruptcy Act and the preservation and incorporation of the courts' general jurisdiction under the Federal equity receivership into the Bankruptcy Act. That its purpose was to insure equality of distribution, adequate control and exclusive jurisdiction over the creditors is manifest.

During the authorship of the Chandler Act, many advocated the complete divorcement of Chapters X, XI, XII and XIII from the Bankruptcy Act to avoid the stigma of bankruptcy and to enable a debtor finding himself in financial difficulties to work out an arrangement with his creditors by way of composition or extension to pay them out of future earnings or wages, thereby rehabilitating himself and completely avoiding the stigma of bankruptcy. This idea was abandoned under the realization that bankruptcy jurisdiction was grounded on the constitution and precedent, and adequate discharge and jurisdictional problems could not be resolved except by tying these salutary remedies into the Bankruptcy Act. Thus the amendments were incorporated in the Chandler Act which completely rewrote the Bankruptcy Act and was enacted into law in 1938.

For like reason much of the doctrine of the Federal equity receivership and the famous case of Phipps v. Chicago, R. I. & P. Ry. Co., 8 Cir., 284 F. 945, 28 A. L.R. 1184, was incorporated in the legislative amendments, the purpose being to carry into the Act the principle that each creditor is a party and a litigant, individually, separately, collectively and by classes.

More and more the philosophy of Alexander v. Hillman, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192, has been adopted and read into the bankruptcy cases whereby each creditor becomes a suitor and the estate a "res" for which each creditor sues and is a litigant. This is in consonance with the Federal Rules of Civil Procedure. Florance v. Kresge, 4 Cir., 93 F. 2d 784, Columbia Foundry Co. v. Lochner, 4 Cir., 179 F.2d 630, 14 A.L.R.2d 1349.

■■ The whole concept of the reorganization chapters is based on the classification of creditors and to treat them in classes and committees and to bind the dissenting creditors by majority rule under statutory procedure. The Court's power to govern the creditors is implicit in its duty to confirm the plan or arrangement and to release a debtor strong enough to go out again in the business world and survive. Therefore, the rehabilitation chapters carry a greater duty than merely arming the bankrupt with a discharge which he may or may not use. True, the Bankruptcy Court will not serve as the guardian to ever after protect and see that the discharge is used. Helms v. Holmes, 4 Cir., 129 F.2d 263, 141 A.L.R. 1367, Vol. 1, Collier on Bankruptcy, page 289, et seq. But in a proper case within the sphere of the "unusual circumstances * * * where special embarrassment arises" as laid down in the case of Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230, Collier on Bankruptcy, Vol. 1, 14th Ed., p. 321, note 42, the Court will protect its order even after the bankruptcy proceedings have terminated, if the bankrupt has an inadequate remedy in the non-bankruptcy court.

In Chapter XI proceedings the Bankruptcy Act clothes the Court with adequate power and jurisdiction, and both Sections 311 and 314 are examples, as are Sections 351, 352 and 367. Section 372 specifically provides:

"Upon the consummation of a proceeding under this chapter after confirmation of an arrangement, the court shall enter a final decree discharging the receiver or trustee, if any; closing the estate; and making such provisions by way of injunction or otherwise, as may be equitable."

■ It has been suggested that Toucey v. New York Life Insurance Co., 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100, is a clear mandate against the exercise of injunctive powers by the Federal courts over State courts. It is well settled that bankruptcy proceedings are exempt from the prohibition of 28 U.S.C.A. § 2283. See both the majority and dissenting opinions in the case of Jacksonville Blow Pipe Co. v. R. F. C., 5 Cir., 244 F.2d 394, affirming D.C., 143 F.Supp. 601.

It is important to note in the instant case that the obligation upon which suit is sought to judgment arose after and was created during the bankruptcy proceeding. The bank relies on cases dealing with security or collateral endorsements which the creditors held prior to bankruptcy. It has long been provided that the secondary liability of endorsers and guarantors is not affected by the discharge. Section 76 of the old Bankruptcy Act did attempt to extend the protection given a debtor to those secondarily liable for the debtor's indebtedness. However, in rewriting the Bankruptcy Act it was felt that Section 76, which extended the obligation of any person who is secondarily liable for or who may have insured or guaranteed such debt or debts, or any part thereof, or bonds issued upon the security of same, went too far and would possibly, if ever contested, be held unconstitutional. Therefore, it was thought best to leave this section out of the debtor's relief chapter incorporated in the Chandler Act.

In the case of Stoll v. Gottlieb, 305 U. S. 165, 59 S.Ct. 134, 83 L.Ed. 104, the sole question before the Court was whether a guarantor who had unsuccessfully litigated his rights in the reorganization proceedings could thereafter recover on the guaranty in an action later brought in another court. The Supreme Court decided that the issue was res adjudicata even though the bankruptcy court in which the reorganization proceedings were pending may not have had jurisdiction of the subject matter. Having litigated in the bankruptcy proceedings the guarantor was bound by the decree, and could not later contest the jurisdiction.

In Steelman v. All Continent Corporation, 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085, the question was " * * * as to the power of a court of bankruptcy, in the situation developed in the record, to enjoin the prosecution of a suit in another federal court upon the ground that the suit, if pressed to a decree, may thwart an inquiry into frauds charged against the bankrupt, or make relief against them difficult."

The Court said:

" * * * The inquiry into the fraud, an inquiry going forward in orderly fashion under the supervision of the court of bankruptcy, will be transferred to another jurisdiction with the supposed fraudulent grantee as *dominus litis*. In such a suit there is danger that the issues to be tried may be so narrowly restricted as to shut out the light. * * * The danger of frustration by such means will be much greater in a suit by All Continent than in one by the trustee, an officer of the court. In the end a fraudulent grantee may gain possession of the securities with power to distribute them among the members of the bankrupt's family, and to do this, moreover, under cover of a decision which will breed confusion and uncertainty in other suits to follow.

"All these embarrassments and obstacles will be removed at a single stroke if the bankruptcy court is free from vexatious interference in its task of supervising and controlling the administration of the assets. * * * " Steelman v. All Continent Co., 301 U.S. 278, at 285–287, 57 S.Ct. 705, at 708–709.

■ General Order 41 provides for an affidavit by the debtor in Chapter XI proceedings "that he has not directly or *indirectly* paid or promised any consideration to any * * * [creditor, attorney, etc.], or other person in connection with the proceedings, except as set forth in such affidavit or in the arrangement or plan, and that he has no knowledge of any such payment or promise by any other party." [Emphasis added.]

It is apparent that the purpose of this General Order was to insure that in approving a plan under the tests outlined in Section 366 of the Bankruptcy Act that all matters are fairly and fully disclosed to the Court, and that one creditor is not preferred or benefitted to the exclusion of the others.

■ The bank participated in and sought and obtained the orders of the Court with full knowledge of the arrangement, and the efforts to reorganize the debtor. If it conceived that it had rights different from or sought to make agreements independent to the other creditors, it was under a duty to seek such orders openly and fairly on the record so that the same might be properly disclosed to interested parties.

No creditor should be allowed to enjoy the fruits of its illy gained advantage nor should any creditor be allowed to take unfair advantage and flaunt the Court's jurisdiction by conducting a transaction in the Court's presence and without the Court's knowledge and without the knowledge of any other interested creditors. The contention that the dealings were with the officers as individuals as distinguished from the corporation is not sound. The Court could deal with the corporation only through these officers who were responsible parties to the Court under the provision of Section 7, sub. b of the Bankruptcy

Act. The conduct of the bank in this case cannot be disregarded. To do so would leave the door open for any reluctant creditor to use unfair and undue pressure to protect his own interests over those of other creditors in any arrangement or Bankruptcy proceeding. The Court has a duty as well as a right to be fully informed as to all that transpires during the working out of an arrangement in a Chapter XI proceeding and of all agreements and all deals that are made concerning the arrangement, if any, when it is called on to approve or disapprove the reorganization.

The Referee's findings of fact in this case are amply supported by competent evidence. The Court feels that his application of law is sound and correct and is of the opinion that the injunction issued by the Referee should stand.

It is, therefore, ORDERED, ADJUDGED and DECREED that the petition for review be, and the same is hereby denied and that the injunction order of the Referee is hereby affirmed.